UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

| | |
|---|---|
| SAMUEL PAUL TYSON, ET AL. | CIVIL ACTION NO. 17-1427 |
| VERSUS | JUDGE ELIZABETH E. FOOTE |
| NATIONAL SPECIALTY INSURANCE CO., ET AL. | MAGISTRATE JUDGE HORNSBY |

**MEMORANDUM RULING**

Now before the Court is a *Daubert* Motion [Record Document 29] filed by Defendants to strike or limit the purported expert testimony of Plaintiffs' witnesses Dr. Rama Letchuman ("Dr. Letchuman") and Lacey Sapp ("Sapp"). Plaintiffs filed a response [Record Document 32]. Defendants then refiled their motion [Record Document 34] to include citations to specific page numbers in accordance with the Court's instruction. *See* Record Document 33. For the reasons discussed below, Defendants' *Daubert* motion [Record Document 34] is hereby **GRANTED in part** and **DENIED in part**. The motion is **DENIED** as to Dr. Letchuman's testimony that Tyson will require RFAs on average once a year for the remainder of his life and as to Sapp's testimony to that effect. The motion is **GRANTED** as to Sapp's testimony that Tyson will need an RFA one and a half times per year, to the extent that it purports to rely on Dr. Letchuman's estimation of once per year.

**I.    Defendants' Motion**

Dr. Letchuman is a pain management physician who treated Plaintiff Samuel Tyson ("Tyson"). Record Document 34-1, pp. 1–2. Defendants assert that Dr. Letchuman will testify that

1

Tyson will annually require a procedure known as a radiofrequency ablation ("RFA"), for the rest of his life expectancy of 24.8 years. *Id.* at 2. Defendants do not contest the medical necessity or appropriateness of the RFAs except to the extent that Dr. Letchuman opines that the procedures will be required for the rest of Tyson's life. Defendants assert that Dr. Letchuman's testimony as to this on-going treatment is "unsupported, unreliable, and does not meet the gatekeeping criteria of *Daubert.*" *Id.* at 3. Defendants also claim that the testimony of Sapp, a life care planner, should be excluded because she has calculated Tyson's future medical costs based on Dr. Letchuman's unsupported testimony. *Id.* at 3–4.

1. Background on the RFA procedure

Dr. Letchuman explained in his deposition that an RFA is a heat treatment in which a doctor burns off part of certain facet joint nerves in the patient's back. Record Document 34-2, p. 30. The purpose of the procedure is to deaden the nerve so that it can no longer transmit pain. *Id.* at 36. Tyson was considered a good candidate for RFAs after he underwent two positive diagnostic facet nerve blocks and they helped to relieve his pain. Record Document 34-1, pp. 2–3. As to the frequency of the RFAs, Dr. Letchuman testified that scientific literature establishes that the nerves that are burned during the ablation procedure will grow back. Record Document 34-2, p. 47. Therefore, another RFA will eventually need to be performed in order to manage pain transmitted from the regrown nerves. *Id.* Dr. Letchuman concluded that "there's no limit to ablations." *Id.* He also stated that the nerve re-growth period can vary between six months and a year and a half, but the average he goes by is one year. *Id.* at 38 & 46. As to Tyson, Dr. Letchuman testified that he would continue to be eligible for RFAs as-needed, on average once a year. *Id.* at 50.

      2.      <u>Objection to the Testimony</u>

Defendants allege that Dr. Letchuman "has no practical experience in administering RFAs yearly for the entirety of a patient's life" and is unaware of studies or scientific literature that would support his recommendation that Tyson will need yearly RFAs for his entire life. Record Document 34-1, p. 7. They base this argument on Dr. Letchuman's testimony that he does not keep data on whether any of his patients declined to return for follow-up ablation procedures. *Id.* Defendants also note that, according to Dr. Letchuman's testimony, Medicare does not cover RFAs because it believes them to be elective. *Id.* at 10. Defendants argue that Dr. Letchuman's opinion regarding Tyson's need for yearly RFAs has not been peer reviewed, studied, or tested and therefore fails all indicia of reliability under *Daubert*. *Id.* at 12.

Defendants cite to *Brandner v. State Farm Auto Insurance Co.*, No. 18-982, 2019 WL 636423 (E.D. La. Feb. 14, 2019), in support of their argument that Dr. Letchuman's testimony should be excluded. *Id.* at 10. In *Brandner*, the district court excluded the testimony of two doctors who recommended that the plaintiff receive RFAs for the remainder of his life as long as he received a benefit from the procedure. *Id.* at *4–*5. This testimony was excluded because neither doctor had established that his opinions had been tested, validated, or generally accepted and the court held that it could not rely on the doctors' own assurances that their opinions were backed by generally accepted scientific methodology. *Id.* at *6.

      3.      <u>Testimony of Sapp</u>

Defendants also move to exclude or limit the testimony of Sapp. Record Document 34-1, p. 14. Sapp's testimony and report reflect an assumption that Tyson will receive RFAs for the rest of his life. Record Document 34-4, p. 21. From her report, it appears that Sapp's calculations assumed that Tyson would require RFAs one and a half times per year for the remainder of his

life. *Id.* at 54–55.[1] Defendants argue that this testimony should be excluded along with Dr. Letchuman's testimony as to the RFAs and that Sapp's calculation of expenses based on Tyson receiving one and a half RFAs per year is not supported by Dr. Letchuman's testimony. *Id.* at 15.

Thus, Defendants' objection to Sapp's testimony is two-fold. First, they object to her testimony assigning a dollar value to future medical costs of the RFA procedure for the rest of Tyson's life expectancy based on Dr. Letchuman's testimony. That is, if the Court excludes Dr. Letchuman's testimony on a lifetime of need, then her testimony calculating expenses based on a lifetime of RFAs should also be excluded. Second, Defendants argue that Sapp has misconstrued Dr. Letchuman's estimate as to the frequency of the procedures because he testified that they would be needed on average once a year, whereas Sapp uses a figure of one and a half times a year to calculate Tyson's future medical expenses.

## II.     Plaintiffs' Response

### 1.     Dr. Letchuman's Testimony

Plaintiffs argue that Defendants' motion should be denied because Dr. Letchuman's testimony that there is no limit to the number of times RFAs can be successfully repeated is supported by scientific, peer-reviewed literature. Record Document 32, p. 1. Plaintiffs provide the

---

[1] The Court notes that Sapp's report bases her calculation that Tyson will require RFAs one and one-half times per year on instructions from a Dr. Nelson. Record Document 34-4, p. 54. The report states that, according to Dr. Nelson, RFAs are "to occur every six months to one year, averaging every nine months, should facet joint injections no longer provide relief." Plaintiffs did not raise Dr. Nelson's testimony in their response to Defendant's motion and Dr. Nelson's testimony is not at issue before this Court. Thus, the Court cannot opine as to whether Dr. Nelson's medical opinion that Tyson will require one and one-half RFAs each year is reliable under the *Daubert* standard. Without a reliable medical opinion as to this additional frequency of treatment, Sapp cannot assign a dollar amount to it. For purposes of this motion, Sapp's conclusions as to future medical costs are tethered by the opinion of Dr. Letchuman. Stated another way, to the extent that Sapp's calculations and testimony at trial are based on Dr. Letchuman's recommendations, she must abide by his average of one RFA per year.

Court with materials published by the Spine Intervention Society ("SIS"), made up of 3,000 Board Certified physician members, that echo Dr. Letchuman's testimony. *Id.* at 4–5. In particular, Plaintiffs cite to a book published by the SIS about spinal treatment procedures, which acknowledges that RFAs are not curative because the cells they affect remain intact and the nerves regenerate. Record Document 32-8, p. 6. Importantly, this book cites multiple scientific studies in support of its conclusion that "there appears to be no limit" to the number of times RFAs can be successfully repeated. *Id.* Plaintiffs conclude that because Dr. Letchuman has relied upon proper methodologies, any attack on his testimony should be done through cross-examination. Record Document 32, p. 9.

      2.    *Brandner* is Distinguishable

Plaintiffs also argue that the expert testimony in *Brandner* was properly excluded because the plaintiffs in that case did not provide the court with a scientific basis supporting the reliability of their proffered medical opinions. *Id.* at 9. Specifically, Plaintiffs assert that "the core RFA concepts articulated by the SIS were never introduced." *Id.* Plaintiffs state that the only evidence supporting the need for lifetime RFAs in *Brandner* were studies showing that RFAs were effective in some patients for ten years. *Id.* Therefore, Plaintiffs assert that the instant case is distinguishable from *Brandner*. *Id.* at 10.

      3.    Testimony of Sapp

Plaintiffs assert that Sapp's opinions are wholly based on the conclusions of their medical experts. *Id.* In essence, her job is not to give medical opinions but to rely on the medical expert testimony as to future medical needs and assign a dollar value to those needs. Plaintiffs argue that because Dr. Letchuman's testimony should be admitted, Sapp's inclusion of future RFAs in her calculations should also be admitted. *Id.*

5

### III.     <u>Legal Standards for Expert Testimony</u>

"[E]xpert testimony is admissible only if it is both relevant and reliable." *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 244 (5th Cir. 2002) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993)). Under Federal Rule of Evidence 402, relevant evidence is generally admissible and is defined, under Rule 401, as that which "has any tendency to make a fact more or less probable than it would be without the evidence" and which "is of consequence in determining the action." Fed. R. Evid. 401 & 402. Rule 702 states that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

*Id.* at 702. Rule 703 goes on to list the three possible sources from which an expert may derive the facts or data upon which his or her opinion is based:

> An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.

*Id.* at 703. Finally, Rule 705 states:

> Unless the court orders otherwise, an expert may state an opinion--and give the reasons for it--without first testifying to the underlying facts or data. But the expert may be required to disclose those facts or data on cross-examination.

*Id.* at 705.

The Fifth Circuit has explained that

> Under [Rule] 702, district courts are assigned a gatekeeping role to determine the admissibility of expert testimony. The court must find that the evidence is both relevant and reliable before it may be admitted. To do so, the court must evaluate whether the reasoning and methodology underlying the testimony is valid and can be reliably applied to the facts of the case.

*United States v. Valencia*, 600 F.3d 389, 423–24 (5th Cir. 2010) (citing *Daubert,* 509 U.S. at 592–93) (internal citations omitted). "This requires more than a glance at the expert's credentials; the court must also ensure that the expert has reliably applied the methods in question." *Id.* (citing *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998) (en banc)). The following factors must be considered by the court when evaluating reliability under *Daubert*: (1) whether a theory or technique can be tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error; (4) the existence and maintenance of standards and controls; and (5) general acceptance of the theory in the scientific or expert community. *Daubert*, 509 U.S. at 593–95.

In *Kumho Tire Co., Ltd. v. Carmichael*, the Supreme Court explained the reach of its earlier *Daubert* decision by concluding that

> *Daubert*'s general holding—setting forth the trial judge's general "gatekeeping" obligation—applies not only to testimony based on "scientific" knowledge, but also to testimony based on "technical" and "other specialized" knowledge. We also conclude that a trial court may consider one or more of the more specific factors that *Daubert* mentioned when doing so will help determine that testimony's reliability. But, . . . the test of reliability is "flexible," and *Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case. Rather, the law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination.

526 U.S. 137, 141–42 (1999) (emphasis in original) (internal citations omitted). The *Daubert* Court summarized the flexible inquiry envisioned by Rule 702 as follows:

> Its overarching subject is the scientific validity and thus the evidentiary relevance and reliability – of the principles that underlie a proposed submission. The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate.

509 U.S. at 594–95.

As the proponents of this expert testimony, Plaintiffs bear the burden of demonstrating that the testimony of both Dr. Letchuman and Sapp is reliable. *Moore,* 151 F.3d at 276. The Fifth Circuit cautions district courts to remember "that the trial court's role as gatekeeper [under *Daubert*] is not intended to serve as a replacement for the adversary system." *Pipitone, Inc*., 288 F.3d at 250 (internal citations omitted). "Thus, while exercising its role as a gate-keeper, a trial court must take care not to transform a *Daubert* hearing into a trial on the merits." *Id*. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

## IV. Application

### A. Dr. Letchuman's Testimony

Plaintiffs have submitted a letter from Dr. Letchuman to the Court explaining his recommendations as to Tyson. Record Document 32-6. The letter explains the origin of the RFA procedure and how it was developed by the SIS. *Id.* at 1. Dr. Letchuman states that the spine intervention community generally accepts that the nerves targeted by an RFA retain the ability to regrow after being cauterized and will regain the ability to transmit pain. *Id.* Thus, to manage pain, the procedure must be repeated after the nerve regenerates. Dr. Letchuman represents that he has not seen any scientific studies showing that the nerve will cease regenerating after a certain number of RFAs. *Id.*

This testimony is sufficient to meet the standards set forth in Rule 702 and *Daubert*. In order to admit expert testimony, "[t]he court must find that the evidence is both relevant and reliable." *Valencia*, 600 F.3d at 423–24. Plaintiffs have presented evidence showing that Dr. Letchuman's testimony as to the necessity of Tyson's lifelong RFAs meets this standard. Importantly, Defendants provide no counter to Dr. Letchuman's letter outlining the scientific reasoning for his opinion and instead rely solely on the *Brandner* case. Plaintiffs assert that the expert testimony in *Brandner* was properly excluded because the plaintiffs did not provide the court with a scientific basis supporting the reliability of the medical opinions because the only evidence supporting the need for lifetime RFAs were studies showing that they were effective in some patients for ten years. Record Document 32, p. 9. Plaintiffs argue that the outcome in this case should be different than the one in *Brandner* because in that case "the core RFA concepts articulated by the SIS were never introduced." *Id.*

The Court agrees with Plaintiffs that *Brandner* is easily distinguished from the instant case based on the quality of the evidence this Court has before it to decide the *Daubert* issue versus the quality of evidence that was presented to the *Brandner* court. Furthermore, "[a]s a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration." *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987). Thus, Defendants may attack Dr. Letchuman's testimony and proffered medical opinions through cross-examination during trial rather than by excluding his testimony. Accordingly, Defendants' *Daubert* motion [Record Document 34] is hereby **DENIED** as to Dr. Letchuman's testimony that Tyson will require RFAs on an average of once a year for the remainder of his life and such testimony will be admitted.

**B.      Sapp's Testimony**

As stated above, Defendants raise two issues with Sapp's testimony. First, Defendants challenge whether she can assign a dollar amount to a lifetime of ablation procedures. Record Document 34-1, p. 14. Because the Court is allowing Dr. Letchuman to testify in his medical opinion that Tyson will need these procedures for his lifetime, Sapp can testify as to what a lifetime of these procedures will cost. As is discussed below, the issue with Sapp's testimony is not the duration of the treatments, but the frequency at which they would occur. The *Daubert* motion [Record Document 34] is **DENIED** as to Sapp's testimony regarding the duration of the RFAs and that testimony will be admitted. *See* Fed. R. Evid. 705.

Second, Defendants contend that Sapp's testimony does not follow Dr. Letchuman's medical opinions. Record Document 34-1, pp. 14–15. Defendants argue that Sapp has misconstrued Dr. Letchuman's estimate as to the frequency of the procedures because he testified that they would be needed on average once a year, whereas Sapp uses a figure of one and a half times a year to calculate Tyson's future medical expenses.  Plaintiffs acknowledge that Sapp is relying on the medical opinions of others—she has no medical opinion of her own. Record Document 32, p. 10. Her job is to take a doctor's opinion as to the need for future medical care and put a dollar amount on it. At this stage of the proceedings, the only medical opinion before the Court as to the frequency of the treatments is that of Dr. Letchuman. Thus, the Court must limit Sapp to that medical opinion. Because Dr. Letchuman has couched his opinion in terms of an average, Sapp can certainly testify that in general the cost of future medical expenses will increase or decrease if Tyson undergoes an RFA more or less frequently than the once per year average, but her testimony must track Dr. Letchuman's recommendation.

To complicate matters, Sapp's report states that her calculations as to the frequency of the RFAs are based on the recommendations of Dr. Nelson. Record Document 34-4, p. 54. Plaintiffs never presented Dr. Nelson's opinion in response to this motion. Certainly, if there is a medical opinion in the record at trial stating that Tyson will require RFAs one and one-half times a year, then Sapp will be allowed to provide that calculation. This ruling does not address Sapp's testimony to the extent that it relies on Dr. Nelson's opinion but merely holds that Sapp may not state that her calculation of one and a half RFAs per year is based on Dr. Letchuman's testimony because Dr. Letchuman estimated that Tyson would require one RFA per year on average. For purposes of this ruling, the Court is assuming that Dr. Letchuman will testify at trial as he has in his deposition. If the trial testimony is different, the Court's ruling may change. Accordingly, the *Daubert* motion [Record Document 34] is **GRANTED** as to Sapp's testimony as to the frequency of the RFA treatments, that is, Tyson will need an RFA one and a half times per year, to the extent that it relies on Dr. Letchuman's estimation that an RFA will be needed only once a year. Without a medical opinion in the record as to any additional frequency of treatment, that testimony will be excluded.

## **CONCLUSION**

For the reasons discussed above, Defendants' *Daubert* motion to strike or limit the testimony of Dr. Letchuman and Sapp [Record Document 34] is hereby **GRANTED in part** and **DENIED in part**. The motion is **DENIED** as to Dr. Letchuman's testimony that Tyson will require RFAs on average once a year for the remainder of his life and as to Sapp's testimony as to the dollar cost of that lifetime of treatment. The motion is **GRANTED** as to Sapp's testimony that

Tyson will need an RFA one and a half times per year, to the extent that it purports to rely on Dr. Letchuman's estimation of once per year.

**THUS DONE AND SIGNED** in Shreveport, Louisiana, on this __29th__ day of June, 2020.

_____
ELIZABETH ERNY FOOTE
UNITED STATES DISTRICT JUDGE